Filed 12/4/20  P. v. Sanford CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE, | C078614 |
| Plaintiff and Respondent, | (Super. Ct. No. P12CRF0180) |
| v. | |
| ANDREW EVAN SANFORD, | |
| Defendant and Appellant. | |

In the summer of 1980, 16-year-old Richard Swanson was found dead in the gas station where he worked, his head wrapped in duct tape from his chin to his eyes; duct tape bound his hands and midsection.  Examination of fingerprints and other evidence from the crime scene in 1980 by the California Department of Justice did not lead to charges, nor did an examination of latent prints by the Federal Bureau of Investigation in 2008.  In 2010 investigators processed the duct tape found on Swanson's body for DNA, using techniques not available in 1980.  The results pointed to defendant Andrew Evan Sanford as a possible contributor.  Based on the DNA results and other facts tying

1

defendant to the crime scene, an information charged defendant with murder with special circumstances. (Pen. Code, §§ 187, 189, 190.2.)[1] A jury found defendant guilty and the court sentenced defendant to life without possibility of parole. Defendant appeals, arguing the trial court:

(1) erred in denying his motion to dismiss based on the delay in bringing charges against defendant, which violated his rights to due process and a fair trial;

(2) erred in excluding evidence;

(3) improperly allowed DNA testimony;

(4) abused its discretion in denying his motion for a mistrial based on juror misconduct;

(5) improperly instructed the jury;

(6) committed sentencing error; and

(7) erred in failing to hold a proper *Marsden* hearing.[2]

We shall affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Richard Swanson was murdered in 1980. Over 30 years later, in 2014, a third amended information charged defendant with murder.[3] The information also alleged the murder was premeditated and occurred in the perpetration of, or attempt to perpetuate, a robbery and a burglary and the special circumstance that the murder was committed while defendant was engaged in a robbery. (§§ 187, 189, 190.2, subd. (a)(17)(A) & (G).) The considerable gap in time between the crime and conviction and the nature of

---

[1] All further statutory references are to the Penal Code unless otherwise designated.

[2] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

[3] The original complaint was filed in 2012.

defendant's claims on appeal necessitate a careful summary of the evidence presented at defendant's jury trial.

**The Murder**

In August 1980, 16-year-old Richard Swanson lived in Lake Tahoe with his family and worked at a gas station in South Lake Tahoe. Swanson worked the late-night shift.

Swanson's dead body was discovered on the morning of August 14, 1980, in the gas station's office. Duct tape bound his body and head; Swanson had been suffocated to death. The office had been tossed and was covered in blood. Approximately $760 was missing from the gas station.

**Investigation of the Crime Scene**

Crime scene investigators Richard Hartman and Richard Munk arrived and photographed the scene. Swanson's body lay on the office floor. He was dressed in a flannel shirt and jeans. Duct tape bound his hands and his midsection. Swanson's head was duct taped all the way around from his lower chin to just below his eyes. A jacket and jumper cables lay on the floor next to the body and a wood chip was found underneath Swanson's head. There were Band-Aids on two of Swanson's fingers and red spots on his pants.

The officers found the office in disarray, with the floor bloody. A Band-Aid, drops of blood, and a small wooden chip were on the desk. On the telephone receiver officers discovered a bloody fingerprint. There were red stains on two boxes and a filing cabinet. Officer Hartman collected only one of the boxes and did not collect the telephone or a sample from the filing cabinet.

A roll of gray duct tape was on top of a first aid kit in the adjacent compressor room. Hartman dusted the first aid kit for fingerprints. The pocket door separating the two rooms was also dusted for prints. There were wood chips, bloodstains, shoe prints, a blood-stained roll of towels, and a tipped over bucket on the floor of the compressor

3

room.  Hartman believed there was blood in the shoe prints, which appeared to be from two different shoes.

Next to the bucket, Hartman found empty soda cans, which he processed for fingerprints.  They did not yield any and Hartman did not collect the cans for saliva tests.  Although Hartman looked at Swanson's shoes, he did not recall if he did any comparisons between the victim's shoes and the bloody prints.  He collected the duct tape, but did not remember if he processed it for fingerprints.

The gas station also had a lube room, which contained a wrecked vehicle.  Hartman processed the tools he found on the room's work bench and wall for fingerprints.  The tools did not yield any prints.  Nearby was a large safe with a padlock on top.  An officer told Hartman he had removed a padlock from the door to the office and placed it on top of the safe.  Hartman collected the padlock as evidence.  Hartman did not collect any of the tools or record the license plate of the car in the lube room.

Hartman could not determine the source of the wood chips.  As he processed the evidence, Hartman changed gloves several times.

Swanson's body was moved from the office to the compressor room.  The body was not placed on a sheet or in a body bag when it was moved.

Outside the gas station was an island with a cashier's booth, cash register, and pump controls.  Officer Munk, not wearing gloves, processed the inside and outside of the booth area for fingerprints.  The cash register was open and contained credit card receipts and some handwritten notes.  Munk did not see any cash in the cash tray.  Munk collected the receipts, notes, and a small amount of cash from the cash booth.

Officer Munk proceeded to contact the customers listed on the credit card slips.  One customer, Frederick Hudson told Munk he had been at the gas station around 5:00 a.m.  Hudson saw a well-dressed White male in cowboy boots, about 50 years old, paying for gas.  In the booth was a White male, between 17 to 19 years old, 5 feet 10 inches tall, with brown hair, wearing a patterned shirt and blue jeans.

4

Another customer, Rodney Jones told Munk he had been at the gas station around 6:15 a.m. and had been unable to locate an attendant. Jones pumped some gas and left a note indicating the amount he had taken and that he would return. Jones saw an officer at a nearby shopping center and contacted the officer.

Two brothers, Howard and Lonnie Stovall owned the gas station. The station manager called Howard around 7:00 a.m. and told him to come to the station. When Howard arrived, Swanson's body had already been removed. Subsequently, Howard determined $761.02 was missing from the station.

**The Autopsy**

Officer Hartman attended Swanson's autopsy. Wood chips were found near Swanson's arm on the sheet used to transport his body, as well as a blue chip of unknown origin.

The duct tape was removed from Swanson's body and collected as evidence. Prior to removing the tape, Hartman processed the tape from Swanson's mouth, nose, and neck for fingerprints. However, he was unable to recover any prints. Hartman did not note whether the tape had been wrapped clockwise or counterclockwise. Hartman also collected Swanson's clothes and a sample of hair as evidence.

Dr. Patrick Riley performed the autopsy, collecting blood, urine, and bile, and ordering a toxicology report. Dr. Riley found a deep laceration in Swanson's head containing pieces of bone from his skull. Swanson had another laceration below his left eyebrow and bruising around the eye. He also had bruising around his lips, crusted blood around his mouth and teeth, and pale and congested areas on his face. Dr. Riley could not ascertain the cause of these injuries.

An examination of Swanson's hands revealed similar pale and congested areas with blood between his fingers. Swanson's lungs were congested with pinpoint hemorrhages on the lining of the vocal cords indicting a lack of oxygen. The condition of Swanson's lips, eyelids, thymus gland, lungs, and kidneys were also consistent with lack

5

of oxygen. His brain was slightly swollen and the blood vessels were distended indicating either a lack of oxygen or pressure around the neck. Swanson's neck muscles and voice box had hemorrhaging, indicating acute trauma.

Dr. Riley determined Swanson's death had occurred within a half-hour of the time the trauma had been inflicted. Swanson's death occurred shortly after the scalp laceration, but the laceration did not cause his death. Dr. Riley concluded Swanson died of asphyxiation due to suffocation. According to Dr. Riley, if Swanson had been found with tape over his face, he was alive when the tape was put on. If Swanson's mouth and nose were covered with duct tape blocking both airways, Dr. Riley estimated Swanson would have died within three to four minutes.

**The 1980 Investigation**

A Department of Justice (DOJ) criminalist received and analyzed evidence in the case and issued a report on October 9, 1980. A DOJ print analyst processed numerous items for fingerprints. He did not process the duct tape for prints because it would impact the criminalist's processing for blood. The print analyst identified fingerprints from Howard Stovall, Donald Ficklin, and Gary Wiegand on various items. None of the prints matched defendant.

In December 1984 Officer Hartman sent the roll of duct tape and the duct tape removed from Swanson's body to the Federal Bureau of Investigation (FBI) for analysis. FBI agent John Massey examined the tape but did not find any latent prints. He returned the items in February 1985.

**The Subsequent Investigation**

In 2006 Kathleen Dougherty, a police department intern entered cold cases, including the Swanson murder, into the computer system. Dougherty stated stolen vehicle report No. 80-9762 was entered into the California Law Enforcement Telecommunications System (CLETS) on August 2, 1980.

FBI forensic examiner Robin Ruth received 52 latent prints from the crime in January 2008. Ruth examined the prints that had not been previously processed and found 12 latent fingerprints, eight latent palm prints, and one latent impression were of value. When Ruth compared the 12 fingerprints to known prints that had been submitted, she was unable to make a match. She also entered nine of the fingerprints into the database but none were identified. Ruth processed the adhesive side of the duct tape, but did not find any prints of value.

A DOJ assistant laboratory director, Krishna Naicker, testified the laboratory first received the latent print cards in 1980 and confirmed the identifications of Wiegand, Donald Ficklin, and Stovall. In May 2012 Naicker examined the print cards previously analyzed by the DOJ as well as the FBI. No identifications were made on the 52 latent print cards. None of the latent print impressions were identifiable as defendant.

In February 2010 DOJ received the duct tape recovered from Swanson's face and other items from the crime scene.

**Expert Testimony on DNA**

At trial, Shawn Kacer, an assistant laboratory director at the DOJ laboratory in Sacramento, testified for the prosecution as a forensic DNA analysis expert. DNA may degrade if it breaks apart. According to Kacer, chemicals, time, and heat may cause DNA degradation. An analyst cannot obtain any results from completely degraded DNA. If a sample is partially degraded a partial result is possible. The partially degraded sample does not give a different result than prior to degradation, but an analyst will obtain less information. The analyst may or may not find DNA for all the people who had contact with the item.

Kacer testified contamination refers to a biological substance added to something that was collected at a crime scene after the crime. If DNA from a second person comes in contact with a DNA sample from a crime scene, the second person's DNA does not change the original DNA. Instead, the DNA becomes a mixture from both people.

However, if one contributor put a greater amount of DNA than another contributor, the analysis might reveal only the contributor of the greater amount. If there was a small amount of DNA and someone bled all over it, the analyst would detect the DNA of the person who bled instead of the original DNA. If the ratio was greater than a 1-to-20 ratio between the two, the analyst would not detect the lower person's DNA.

Kacer defined transfer as a biological sample that is moved from one location to another through an intermediate source. For example, a primary transfer would be one person touching something directly and leaving DNA. A secondary transfer would be if a person bled onto a table and someone else picked up the blood and transferred it to another location. In that case, the DNA sample would be on something the original person never touched. The transferability of a DNA sample depends on whether the sample is wet or dry, the friction applied to the biological fluid, the amount of DNA originally deposited, the mode of transfer, and the material on which the DNA sample is initially on.

### DNA Analysis of Duct Tape

Kacer analyzed samples from the Swanson murder. He observed some degradation of the DNA samples. According to Kacer, one of the DNA samples from the duct tape roll and one of the samples from the flat side of the duct tape wrapped around Swanson's hands contained a mixture of DNA from two contributors. Swanson was one contributor, and defendant could not be ruled out as a contributor. All the other reference samples were excluded as possible contributors.

A second sample from the duct tape roll contained a mixture of DNA from Swanson and at least two or more minor contributors. Defendant could not be excluded as a possible contributor to the minor types, but defendant could not be the source of all the minor types. All the other reference samples were excluded as possible contributors.

Kacer also described the results from a sample from the sticky side of the duct tape wrapped around Swanson's hands. The sample contained a mixture of two

8

contributors. For the sample, Kacer used a different typing called a Minifiler kit, which is designed for low-level degraded samples. The kit tests fewer locations than other tests. Kacer uploaded the information into the database on December 17, 2009, and January 5, 2010. The results identified defendant as a candidate.

Kacer requested a reference sample from defendant, which he received on February 16, 2011. He obtained a DNA profile and could not exclude defendant as a source of the foreign types to Swanson. According to Kacer, the probability that a random unrelated individual would by chance be included as a possible foreign contributor was approximately one in 240 million African-Americans; one in 100 million Caucasians; and one in 67 million Hispanics.

On cross-examination, Kacer testified he did not know when the DNA had been deposited on the tape; it was possible it happened before the murder. Kacer also stated that as for the blood stain, he could not determine if one person's DNA was deposited at the same time the blood was shed. Kacer did not find anything consistent with defendant's DNA on the tape around Swanson's head or waist, on the padlock, the telephone, the paper towels, the cloth towel, or the box. Nor did Kacer find any of defendant's DNA on Swanson's shoe or shoelaces. Kacer acknowledged that DNA could be transferred by fingerprint brushes from one place to another.

A DOJ criminalist, Ricci Cooksey, began working on the case in March 2012. Cooksey focused on whether the pieces of duct tape were at one time joined together. Cooksey testified the tape looked as though it had been torn, not cut. There were a number of pieces Cooksey determined had come from one long strand of tape. Cooksey examined the two pieces of duct tape where Kacer had found the DNA samples. The two pieces fit together and at one time were part of a continuous roll.

**Circumstances Surrounding the Murder**

*The Gas Station*

At the time of the murder, Rodney Jones was working on a nearby construction project. He drove a pickup truck and got fuel at the gas station almost every day. He did not recall speaking to Officer Munk in 1980 and did not recall the events of the day of the murder.

Another customer, Frederick Hudson, was renting a vacation house with his family. He stopped at the station around 5:00 a.m. to get gas. Hudson used a credit card to pay the attendant, a young White male. While Hudson was there, one customer came in and paid cash; Hudson did not notice anything strange. He was never contacted by police.

The parties stipulated that Harvey Fisher reported to law enforcement the day after the murder. He had arrived at the gas station at about 6:00 a.m., driving by the pump area. As soon as he drove onto the paved area of the station, two White males came out of the office and walked toward him. As Fisher drove by, the pair stopped walking and returned to the office. Fisher left the gas station about five minutes after he arrived. He saw no vehicles at the gas pumps or by the restrooms. The two men he saw were in their early twenties, wore dark clothes, and were neat in appearance. Fisher did not later recall being at the station or talking to police.

At the time of the murder, Timothy Deal worked as an attendant at the gas station. Deal last saw Swanson the day of the murder. Swanson worked the midnight-to-8:00 a.m. shift. On his way home, Deal pulled into the station around 2:00 a.m.; Swanson was alive at that time.

Donald Ficklin worked the 4:00 p.m.-to-midnight shift at the gas station. He last saw Swanson when Swanson started his shift. At that time, Donald transferred the keys to Swanson, counted the cash register receipts, and reset the pumps. Donald left the station after midnight and heard about the murder the next morning.

10

Donald and his twin brother, Ronald attended high school with defendant. During the summer of the murder, defendant would stop by the gas station at least once a week to visit Donald. Occasionally, Donald would let defendant in the cashier's booth with him. Donald owned a Dodge Ram Charger with a removable top. He occasionally worked on the car at the gas station and defendant would sometimes help. Donald did not remember working on cars with defendant in the gas station's bay area, nor did he recall working with defendant on a car in the parking area. Donald did not recall seeing duct tape in the shop area or using tools from the gas station to work on cars.

Officer Munk interviewed Donald the day after the murder. Donald stated prior to leaving his shift, he cleaned up the lube room and put a roll of duct tape in a cabinet in the lube room.

Occasionally, defendant would stop by the gas station to borrow money or gasoline. Donald would give defendant money from the cash drawer and put a draw slip in the drawer. On one occasion, Donald's cash drawer was short after his shift. Defendant had stopped by to visit and Donald stepped away from the booth while defendant was there. Defendant was unemployed at the time.

During that summer, defendant stayed at Donald's grandparents' home because he needed a place to live. Donald's grandfather owned a repossession business and had a storage yard for the cars. The keys to the storage yard and the cars were in an office at the house. While defendant lived there, a car was stolen from the yard and defendant was asked to leave for stealing the vehicle.

About a week before the murder, Donald saw defendant walking down the road towards the gas station. It was the last time he saw defendant.

Donald's twin brother, Ronald was good friends with defendant until February 1979. Ronald next saw defendant in July 1980 when defendant returned to town. Defendant lived with their grandparents for about three weeks; he did not have a car or a job. Ronald twice saw defendant in the lube area of the station working on Donald's

11

Ram Charger. At times Ronald saw defendant in the booth standing behind the cashier's seat.

According to Ronald, he last saw defendant the night before the murder. At around 10:00 p.m. defendant walked out of his grandparents' bedroom. Ronald believed defendant might be stealing. He followed defendant and they ended up yelling and throwing a few punches at each other. Ronald believed it was the same night that a car was taken from the storage yard. His grandfather reported the vehicle stolen, and Ronald believed it was a small pickup truck that had been stolen.

Dianna Ficklin was dating Ronald in 1980. In July 1980 she saw defendant at the gas station when she was there with Ronald. She never saw defendant working on Donald's Ram Charger and never saw him inside the gas station or the garage.

One of the gas station owners, Howard, testified the station was open 24 hours a day. The door to the cashier's booth was always locked. Money was kept in the booth below the tray; the tray would be pushed out the window for people to pay. There was a floor safe in the concrete floor of the station. Only employees running the cashier booth had access to the safe in the office, and they only had a key to the top part of the safe.

Howard locked the office when he went home around 5:00 p.m., but the key to the padlock might have been left at the cashier booth in front of the gas station. The work bench contained tools the employees could use. The station's mechanics kept their tools in a separate mechanic's shop in the back of the station. Howard had seen Donald work on his car both inside and outside the gas station.

### Other Connections

In the summer of 1980, Timothy Blankenship hung out with friends including defendant, Donald, and Ronald. Blankenship saw defendant working on Donald's vehicle at the gas station that summer. The Ram Charger's back cover was off and Blankenship remembered the interior was nice; he did not remember if the roll bar was wrapped in tape. Blankenship last saw defendant a week before the murder. Defendant

12

came to Blankenship's house and said he wanted to do some "jockey boxing," a term for stealing things out of cars.

Blankenship had three burglary convictions in 1982 and 1983, a felony controlled substance conviction in 1996, a felony assault conviction in 1999, a felony drug conviction in 2004, and a felony assault conviction in 2007. Blankenship denied being at the gas station the night of the murder and denied killing Swanson.

Peggy Burnham also knew defendant in high school. At trial, Burnham recalled walking to her car near the gas station and finding defendant in the driver's seat of her car "around the time that Richard Swanson was killed." Defendant grabbed her arms and shook her, frightening Burnham. The prosecution played two recorded statements by Burnham. Burnham reviewed the 1980 taped interviews she gave to officers and believed them to be truthful.

In the 1980 interview, Burnham stated she had been in a parking lot near the gas station the day of or the day before the murder. Defendant was sitting in her car and she was afraid he was going to steal it. When Burnham asked defendant what was going on he told her to give him money and grabbed her purse. Burnham refused and defendant grabbed her. She told defendant she only had $2 and he became upset and asked "What about the station? What about the Shell station?" Defendant began "flippin' out" like he had to rush over to the station.

## Defendant's Record

The parties stipulated defendant was arrested on March 17, 1980, in Long Beach and booked under his true name, Andrew Evan Sanford. In November 1980 defendant was arrested in Eureka and booked under the name Richard Edward Simms. He had grabbed a ring at a jewelry store and run out the door. Defendant had a pair of metal handcuffs in his pocket.

13

In April 1982 in Anaheim, defendant was arrested again and booked under the name Michael Andrew Cardo. An officer found defendant climbing out of the roof of a jewelry store in the early morning.

Later that year, defendant came in contact with Las Vegas police and he identified himself as Michael Andrew Cardo. A records check revealed an outstanding El Dorado County warrant for unlawful taking of a vehicle and he was arrested. Defendant was transferred to El Dorado County and booked. At that time he was questioned by a South Lake Tahoe detective about the Swanson murder. Defendant told the detective that after stealing the vehicle, he was at an Anaheim hotel for several weeks. He provided the detective with the name of the hotel and the name of the friend who had dropped him off at the hotel and could verify his whereabouts. Defendant was arrested again in Anaheim in 1984 and booked under his real name.

**Admissions to Jenna Weller in 2010**

Jenna Weller met defendant in 2010; she was a friend of defendant's roommate, Nathalie LeBourveau. After LeBourveau moved out, Weller moved in with defendant. The pair had a nonexclusive sexual relationship. The mother of defendant's son, Tammy Brazil, frequently stayed at the house.

After Weller moved in, defendant asked her if she thought God forgave murderers. Weller said she did and gave defendant examples from the Bible. Defendant told Weller that when he was younger, he and friends did something and thought a kid might have died. Defendant asked Weller if she could kill someone and she replied that she could if it was either her or them, because she wanted to live. Weller did not question defendant further because she needed a place to stay.

Weller mentioned the conversation to LeBourveau when the former roommate visited the house on Thanksgiving. LeBourveau said something that made defendant cry. Weller commented about defendant being a killer, yet LeBourveau had made him cry. However, LeBourveau testified that Weller never mentioned defendant "making a

14

statement about killing somebody," being involved in a killing, or anything about defendant and death.

In December 2010 Weller moved out of defendant's place and was at an apartment with Brazil. Defendant came to the apartment and kicked down the door looking for Weller. He threw Brazil to the ground and beat her up. While defendant asked where Weller was, Weller hid under the bed and called the police.

Defendant was still at the apartment when police arrived. Weller was afraid and did not want defendant to know she had contacted the police. Brazil went outside and talked to the police. After Brazil told Weller defendant was gone, Weller went outside and talked to the police. She did not tell them about defendant's earlier statements.

Weller did not contact the police about defendant's statement regarding God forgiving murderers. Investigator Paul Moschini contacted her. Prior to speaking with Moschini, Weller had a serious drug and alcohol problem and had entered rehab in 2012. She had been sober for two years. Initially, Weller did not tell Moschini she and defendant used methamphetamine, but did tell him the second time they spoke. The night she and defendant talked about murder Weller had not used methamphetamine.

Weller testified her mother stated that Weller moved out on September 25, 2010, but she believed her mother was mistaken. Weller was not completely honest with her mother about living with defendant.

**Defense Case**

The defense argued there was a noncriminal explanation for defendant's DNA in the gas station that summer. Donald and Ronald Ficklin's brother Richard worked at the gas station the summer of the murder. He worked the graveyard shift. Richard performed routine maintenance around the station. He did not recall if he hauled trash to the dumpster every night, but it was part of his chores to dump the trash before the morning shift.

15

Richard testified Donald worked on his Ram Charger during the summer in the station bay and defendant sometimes helped him. During the summer of 1980, Donald, defendant, and Timothy Blankenship were frequently at the garage to make repairs to Donald's car. At trial, Blankenship recalled that the top of the Ram Charger had been taken off that summer and had a roll bar. He could not recall whether the roll bar had been wrapped in duct tape.

Based on this evidence, defense counsel argued defendant's DNA was at the scene since he worked in the gas station garage and handled tools. In the initial processing of the murder scene, items were touched, moved, and brushed for fingerprints using a single brush, making it likely defendant's DNA was transferred onto the evidence. The handling and lab analysis of the duct tape collected from the scene did not follow modern protocol to avoid contamination. Therefore, defendant's DNA could have been transferred onto evidence taken from the murder scene.

After the Ficklin grandparents asked defendant to leave, Richard saw him at the gas station in the Ram Charger with Donald. A truck was stolen from his grandfather's storage yard the same night Swanson was killed or the day before.

Nathalie LeBourveau met defendant in August 2010 when she needed a room to rent. Defendant said he was a car specialist and would rent her a room in exchange for her helping him drive cars to his house so he could work on them. Defendant lived in the house with his three kids. LeBourveau only lived briefly with defendant; she moved out after defendant touched her.

Weller visited LeBourveau at defendant's place about four times. When she moved out, LeBourveau suggested Weller move in. LeBourveau did not tell Weller why she left and Weller moved in October 2010. On Thanksgiving 2010 LeBourveau visited Weller. Defendant wanted Weller to leave. LeBourveau and Weller laughed because Weller paid most of the rent. LeBourveau remembered defendant crying.

16

Weller's mother had recorded on her calendar that Weller moved in with her on July 11, 2010. Weller lived with her until September 25, 2010. Weller's mother thought Weller then moved in with a friend for a few weeks and then found another place to live.

Defense counsel argued the murder investigation had been mishandled. Counsel argued evidence was possibly destroyed or contaminated when Swanson's body was dragged across the garage floor, crime scene tape was not placed at the scene, and there was no record of those present at the crime scene following the murder. Defense counsel also commented on the duct tape where defendant's DNA was detected, noting there was DNA of at least four different contributors, and other fingerprints at the scene were never identified. According to defense counsel, the evidence pointed to "unknown people that are involved in this case" who were never apprehended.

Defense counsel pointed to the 32-year gap between Swanson's murder and the filing of charges to argue critical evidence was lost in the interim. In 1982, when questioned by a South Lake Tahoe detective, defendant said he was at an Anaheim hotel at the time of the murder. However, at the time of trial, the hotel records had been destroyed and witnesses that could have testified were dead.

**Verdict and Sentencing**

The jury found defendant guilty of first degree murder and found both special-circumstance allegations true. The court sentenced defendant to life without possibility of parole. Defendant filed a timely notice of appeal.

**DISCUSSION**

**I**

*Precharging Delay Claim*

The gap between Swanson's murder and defendant's prosecution provides defendant's initial challenge to his conviction. Defendant sought to dismiss the charges based on the delay. The trial court denied the request. Defendant argues the trial court erred because the delay violated his right to due process and a fair trial, focusing on two

17

distinct claims.  According to defendant, the trial court failed to determine if the prosecution's conduct was negligent and also failed to balance the prejudice to defendant against the prosecution's reasons for delay.

**Background**

The People filed the complaint against defendant on April 2, 2012.  On December 4, 2013, defendant filed a motion to dismiss the charges.  He alleged the complaint violated his rights to a speedy trial and due process caused by undue prosecutorial delay.

The parties stipulated to several facts at the hearing on the motion.  The pipe the defense referred to in the motion was destroyed under normal police procedures.  Gary Wiegand, defendant's mother, and Sergeant Ritter were deceased.  The cell phone company responded to a subpoena that they had no records for defendant's phone between July 1, 2010, and December 31, 2010.  The company only retained its records for six months.  In addition, the parties stipulated as to Harvey Fisher's version of events the morning after the murder as set forth in Sergeant Ritter's police report.

At the hearing, Terry Daniels testified that, while a detective sergeant from 1999 to 2001, he had been assigned to handle cold cases for the police department.  Approximately 14 cold cases were assigned to various investigators.  As investigators caught up on their workload, they turned to the cold cases.  No one investigator was assigned the Swanson cold case.  Due to insufficient staffing, and the priority given to active policing, the cold cases might proceed at a "snail's pace" but they were always worked on.

In 2006, while Daniels was police chief, Swanson's family attended a city council meeting seeking justice.  Daniels requested a review of the case and was told progress could be made with proper staffing.  Subsequently, Daniels assigned an officer to the case and worked with the city government to fund a retired FBI agent to assist with the investigation.

Defense counsel argued it had been prejudiced by the loss of the Anaheim hotel's records, which would support defendant's alibi. The parties stipulated that the owner of the hotel told an investigator he had kept records for five years for tax purposes and then disposed of them. He had no records of any tenants from the 1980's and had no memory to assist with the investigation. The defense also contended Fisher's failure to recall that he had seen two people at the gas station, neither of whom matched defendant, also prejudiced defendant. Moreover, there had been major gaps in the progress of the investigation where the case had been essentially ignored.

The trial court denied defendant's motion without prejudice. In denying the motion, the court relied on *People v. Nelson* (2008) 43 Cal.4th 1242 (*Nelson*). The court found defense counsel had demonstrated some prejudice due to the delay and had cited specific examples. However, the court determined the prejudice was minimal.

The court balanced the prejudice to defendant against the justification for the delay. As a consequence, the court determined the justification for the delay was strong, consisting of investigative delay and nothing else. Although police had early in the case suspected defendant might be involved, it was not until the cold case investigation began that defendant's involvement became evident. The court observed: "Investigative delay is fundamentally unlike delay undertaken by the government agency solely to gain a tactical advantage over an accused because investigative delay is not so one sided." According to the court, there was "absolutely no indication . . . that the delay was solely for the purpose of gaining a tactical advantage." The delay in this case, as in *Nelson*, was purely "an investigative delay and nothing else."

Following the verdicts, defendant filed a motion for a new trial renewing his motion to dismiss based on precharging delay. Defendant argued Sergeant Ritter was aware of defendant's claim that he was at the Anaheim hotel, but no followup investigation was done to corroborate the information. The prosecution responded that there was no credible evidence that the hotel's records would assist defendant. Although

19

defendant told Ritter he was living in Anaheim most of the time since 1980, he did not tell Ritter he had been arrested in Humboldt County in November 1980 and served jail time. Accordingly, defendant's credibility was suspect. The court denied the motion.

**Discussion**

Both the state and federal Constitutions protect a defendant from the prejudicial effects of lengthy delay between the commission of the crime and the defendant's arrest and charging. (*Nelson, supra*, 43 Cal.4th at p. 1250.) Under federal law, due process requires dismissal of the indictment if it is shown that delay in the case caused substantial prejudice to the defendant's right to a fair trial and that the delay was an intentional effort to gain a tactical advantage over the defendant. (*People v. Martinez* (2000) 22 Cal.4th 750, 765.) Defendant concedes the record before us does not support a finding of intentional delay for the purpose of tactical advantage.

Under California law, negligent delay in bringing charges, when accompanied by a showing of prejudice, may violate due process. Negligent delay requires a greater showing of prejudice to establish a due process violation. (*Nelson, supra*, 43 Cal.4th at pp. 1255-1256.) The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay. To avoid murder charges due to delay, the defendant must affirmatively show prejudice. (*Id.* at p. 1250.) We review the trial court's ruling on a motion to dismiss for prejudicial delay for an abuse of discretion. We defer to the trial court's findings of fact if supported by substantial evidence. (*People v. Cowan* (2010) 50 Cal.4th 401, 431.)

Defendant challenges the trial court's denial of his motion for a failure to determine whether the delay was negligent or to make a " 'sensitive balancing' " of the justification for the delay against the actual prejudice to defendant. In addition, defendant argues: "[A]lthough the delay here may not have been done intentionally to gain a tactical advantage, there is nothing to applaud here. The state's conduct in

20

knowingly assigning this case to detectives who could not work on it for nearly 32 years cannot outweigh the prejudice to [defendant] – where critical alibi witnesses were lost and the strength of the state's case against [defendant] was not strong. [Citation.] The remaining defense evidence considered in combination with the potential impact of the lost alibi evidence show that the harm could not be outweighed even by purely investigative delay." We disagree.

Any balancing formula can be skewed to support a preferred result. Defendant skews both sides of the equation by minimizing the People's investigative efforts while magnifying the harm done to his case by the passage of time. Having exhausted available leads the police department assigned this cold case and others to investigators for review with the hope that additional information might come to light in the future. It was not an exercise in futility but a prioritization of resources and a commitment to never give up, though working on it as time allowed and as resources became available.

The " 'sensitive balancing' " sought by the defendant was actually achieved by the trial court in balancing the harm to defendant against the justification for the delay set forth in *Nelson, supra*, 43 Cal.4th 1242. The court began by considering the all the aspects of the case on which defendant based his claim of prejudice. The court concluded defendant demonstrated some prejudice due to the delay, but the prejudice was minimal. The court proceeded "to balance the prejudice in this case against the justification for the delay." The balance revealed "absolutely no indication . . . that the delay was solely for the purpose of gaining a tactical advantage." The court relied on a similar finding in *Nelson* and we find the comparison compelling.

In *Nelson*, in 2002 investigators compared evidence from a 1976 murder scene with the defendant's DNA and identified him as a possible donor of the evidence. A jury subsequently convicted defendant of murder. The defendant appealed, arguing the delay in prosecution violated his right to due process. (*Nelson, supra*, 43 Cal.4th at p. 1247.)

The Supreme Court found the minimal prejudice to the defendant outweighed by the strong justification for the delay. (*Id.* at pp. 1255-1256)

The defendant in *Nelson* challenged the investigative delay, arguing the DNA technology had existed years before the law enforcement agency made the comparison in his case, a delay which amounted to negligence. The Supreme Court disagreed: "A court may not find negligence by second-guessing how the state allocates its resources or how law enforcement agencies could have investigated a given case. '[T]he necessity of allocating prosecutorial resources may cause delays valid under the [*United States v.*] *Lovasco* [(1977) 431 U.S. 783 [52 L.Ed.2d 752] ] analysis. [Citation.] Thus, the difficulty in allocating scarce prosecutorial resources (as opposed to clearly intentional or negligent conduct) [is] a valid justification for delay . . . .' [Citation.] It is not enough for a defendant to argue that if the prosecutorial agencies had made his or her case a higher priority or had done things a bit differently they would have solved the case sooner." (*Nelson, supra*, 43 Cal.4th at pp. 1256-1257.)

The Supreme Court concluded that balancing the prejudice the defendant demonstrated against the strong justification delay, produced no due process violation. The court agreed with the appellate court's summary: " '[T]he delay was not for the purpose of gaining an advantage over the defendant. [Citation.] Indeed, the record does not even establish prosecutorial negligence. The delay was the result of insufficient evidence to identify defendant as a suspect and the limits of forensic technology. [Citations.] When the forensic technology became available to identify defendant as a suspect and to establish his guilt, the prosecution proceeded with promptness. Without question, the justification for the delay outweighed defendant's showing of prejudice.' " (*Nelson, supra*, 43 Cal.4th at p. 1257.)

We find the situation before us analogous to that considered by the court in *Nelson. People v. Booth* (2016) 3 Cal.App.5th 1284 (*Booth*), relied upon by defendant, does not persuade us otherwise. In *Booth*, the appellate court considered a claim of

22

ineffective assistance based on counsel's failure to file a motion to dismiss based on a precharging delay of 19 years. (*Id.* at p. 1288.)

The court found the delay prevented the defendant from obtaining the crucial testimony of an alibi witness who could have exonerated the defendant. The prosecution's case was "simply not very strong." (*Booth, supra*, 3 Cal.App.5th at p. 1310.) The court concluded: "Our only concern is that the limitations of the prosecution's witnesses likely exacerbated the prejudice Booth suffered as a result of the lengthy precharging delay that occurred in this case. Because of that delay Booth was unable to obtain the testimony of Ellis Bradford, who is on record as saying Booth was not among the people he saw carry out the shooting. Balancing the prejudice . . . against the state's justification for the precharging delay, and considering the weakness of the prosecution's case against Booth, we conclude it is at least reasonably probable the trial court would have found the delay violated Booth's right to a fair trial. Trial counsel was ineffective for failing to move to dismiss the case on that basis." (*Id.* at pp. 1311-1312.)

Here, in contrast, the prosecution's case against defendant, based on the DNA evidence, was not weak. The delay, as in *Nelson*, stemmed from the limits on forensic technology. Defendant cannot point to the loss of a crucial witness as a consequence of the delay. We find *Booth* distinguishable. The trial court did not err in denying defendant's motion to dismiss based on precharging delay.

## II

### *Exclusion of Evidence*

Defendant faults the trial court excluding two types of evidence. First, defendant contends the court erred in excluding evidence of third party culpability: (1) evidence that fingerprints of two men with theft-related backgrounds were discovered on beer cans found in the trash at the gas station, (2) the police investigation of Frank Ingram's 1983 robbery in Sonora, and (3) evidence about the destruction of the pipe found a distance away from the gas station and turned into the police after the murder. Second, defendant

23

argues the court erred in excluding expert testimony offered by the defense from a former police officer who stated he would have investigated the present case differently.

**Background: Third Party Culpability**

At the time of the murder, police recovered two beer cans; a Coors can in the trash near the cashier's booth and a Busch can in the trash outside the gas station restroom. At the time, the prints could not be identified.

In 2009 law enforcement processed the fingerprints through several fingerprint identification systems. The Coors can's fingerprints were identified as belonging to Michael Wheeler; the Busch can fingerprints belonged to Corey Silva. Wheeler had a stolen property arrest in 1982. When contacted by the prosecution, Wheeler stated he had been in the Tahoe area for a one-day gambling trip during the summer of 1980. Silva had five theft-related arrests between 1979 and 1982, including one in the Tahoe area in March 1980. He died in 2005.

Frank Ingram committed a robbery in 1983 in a store in Sonora. Ingram used duct tape to bind the two victims, including tape around their mouths. When interviewed in prison in 1995, Ingram denied being in the Tahoe area in 1980. The interviewing officer confirmed that Ingram's employer, girlfriend, and ex-wife stated he was working in San Francisco in 1980. No one was aware of Ingram traveling to Tahoe. Ingram had been to Tahoe once in 1969 and did not like it. Ingram provided the officer with a blood sample.

Defendant sought to admit the evidence at trial. The trial court denied defendant's request.

The court began by noting that, under applicable case law, opportunity and motive were not enough. The court continued: "In this particular case we have these beer cans, one out by the island, one by the restroom with no evidence -- there has been no evidence concerning trash cans . . . the first time anything came up about trash cans was when you were asking about these two bags that are now marked and identified in evidence, though not admitted. [¶] There is absolutely no information of when those cans were placed

24

there.  There's no indication that . . . there's all kinds of suppositions we could make.
They stopped there on their way somewhere, got gas, went to the bathroom, threw beer
cans away.  Other than that, there's nothing to indicate even close proximity without
speculation and surmising which would form the basis of third-party culpability evidence.
[¶]  So I . . . would exclude the information.  It's just not relevant to this jury's inquiry.  It
wouldn't be as simple as just having the fingerprint information brought in and
interpreted in identifying these people.  Then we have to get into their long record.  And
in one particular case since he's deceased . . . the one person cannot respond as to his
whereabouts."

The court also considered defendant's request:  "The information [is] that . . . the
one who survived even gave a blood test according to the response.  . . . Frank Bruno,
AKA Ingram, it's all innuendo and speculation.  So none of the proffered third-party
evidence is sufficient to meet the *Hall* standard.[4]  And so I would deny any reference to
or admission of the third-party culpability at this juncture."

The trial court also excluded evidence of a metal pipe found in a nearby shop a
few days after Swanson's murder.  The pipe was turned over to police, but was never
processed as evidence and was destroyed two years later.  The court sustained the
prosecution's objection to the evidence based on Evidence Code section 352.

**Background: Expert Testimony Regarding Investigation**

During an Evidence Code section 402 hearing, former homicide investigator Ray
Biondi testified regarding the investigation in the present case.  Biondi described how he
would have investigated a homicide in 1980.  In preparation of his testimony, Biondi
reviewed the investigating officers' reports of their response to the crime scene,
diagrams, evidence sheets, and crime scene photographs.  Based on this evaluation,

---

[4]  *People v. Hall* (1986) 41 Cal.3d 826 (*Hall*).

Biondi termed the police investigation a "very tepid response" to a major crime and the investigation "lacked leadership."

According to Biondi, the tools found at the murder scene should have been collected, not just processed. For example, the telephone receiver officers had dusted for prints should have been collected. Biondi also testified that moving Swanson's body could have caused contamination and the body should have been moved to a sterile body bag. In addition, Biondi testified more items from the compressor room should have been collected and processed for latent prints and all the vehicles around the gas station should have been described. Biondi testified that if evidence is not initially collected, concerns over contamination can arise.

During cross-examination, Biondi testified he had not spoken with any of the officers who responded to the crime scene. Nor had Biondi reviewed the reports of Officer Munk or an Officer Scott. Biondi explained his review focused on the initial response to the investigation.

Defendant argued Biondi's testimony was relevant to show the proper procedures should have been followed and the failure to do so inhibited the collection of evidence exculpatory to defendant. The court found Biondi's testimony lacked relevance. According to the court, no evidence supported the claim that if the investigation had been conducted according to Biondi's rubric, it would have resulted in the discovery of exculpatory evidence. Biondi's testimony would add nothing to the evidence and would not aid the jury.

**Discussion**

Defendant contends the court's exclusion of this evidence violated both his state and federal right to present a defense and to a fair trial. In addition, defendant asserts the exclusion directly undercut his only defense, and the prosecution relied on the absence of the proffered evidence to argue that defendant murdered Swanson.

26

Only relevant evidence is admissible at trial.  (Evid. Code, § 350.)  Evidence raising a reasonable doubt as to a defendant's guilt, including evidence that a third party committed the crime, is relevant.  Such evidence is admissible if capable of raising a reasonable doubt of a defendant's guilt.  However, evidence that another person had motive or opportunity, without more, is not relevant.  Such evidence does not raise a reasonable doubt about a defendant's guilt.  To be relevant, evidence must link the third person to the actual commission of the crime.  (*Hall, supra*, 41 Cal.3d at p. 833.)

The trial court may exclude relevant evidence if it creates a substantial danger of prejudicing, confusing, or misleading the jury, or would consume an undue amount of time.  (Evid. Code, § 352.)  We review the trial court's exclusion of evidence for an abuse of discretion.  (*People v. Chism* (2014) 58 Cal.4th 1266, 1291.)

### Evidence of Third Party Culpability

Defendant argues the court erred in excluding the evidence regarding Silva, Wheeler, and Ingram since it was directly probative of the defense claim that evidence surrounding the crime was not properly collected or investigated.  Such evidence would have been directly probative of the defense theory that unknown people were involved in the case.

The trial court excluded evidence of Silva's and Wheeler's fingerprints found on beer cans at the gas station.  Under the court's reasoning, the presence of these fingerprints on beer cans in trash cans located in common areas of a gas station open 24 hours was not direct or circumstantial evidence linking Silva and Wheeler to Swanson's murder.  As noted, evidence of mere motive or opportunity to commit the crime is not sufficient to raise a reasonable doubt about the defendant's guilt.  (*Hall, supra*, 41 Cal.3d at p. 833.)  As a consequence, evidence of Silva's or Wheeler's history of thefts was similarly not admissible.  In addition, the court considered Evidence Code section 352 and determined the evidence would prove lengthy and complicated, in part,

27

because of Silva's death. We find no abuse of discretion in the exclusion of this evidence.

In addition, the court excluded evidence concerning Ingram, who allegedly robbed a store in Sonora in 1983 and used duct tape to bind his victim. The court found the evidence was not relevant because it was based on speculation. No evidence placed Ingram in the area where the murder took place. Instead, witnesses stated Ingram had been in the area only once, in 1969. Again, the court acted well within its discretion to exclude the evidence based on the criteria enunciated in *Hall.*

Finally, the trial court excluded the pipe. Again, no evidence linked the pipe to Swanson's murder. The pipe was found days after the crime and some distance away. We find no error.

### *Expert Testimony Evidence*

To be admissible, expert opinion testimony must be related to a subject sufficiently beyond common experience so that the opinion would assist the trier of fact. (Evid. Code, § 801, subd. (a).) Expert opinion is not admissible if it consists of inferences and conclusions which can be drawn as easily by the trier of fact as by the expert. (*People v. Torres* (1995) 33 Cal.App.4th 37, 45.) The trial court should admit expert testimony that aids the jury because it references matters requiring some expertise, but should exclude testimony if it addresses matters the jury can understand and judge for itself. (*People v. Smith* (2003) 30 Cal.4th 581, 628.)

Here, defendant's expert, Biondi, testified as to how he would have conducted the investigation into Swanson's murder in 1980. However, the trial court concluded Biondi did not provide any evidence that if the investigation had been conducted as he proposed, it would have resulted in the discovery of evidence casting doubt on defendant's guilt. The court also applied Evidence Code section 352 and determined the probative value of Biondi's testimony was minimal and would not assist the jury in evaluating the evidence before it. The court acted within its discretion in excluding the testimony.

28

# III

## *Testimony Regarding DNA Evidence*

Defendant argues the trial court erred in admitting DNA evidence that defendant could not be excluded as a contributor to the partial DNA profile in two mixed-source samples from the duct tape roll and one mixed-source sample from the flat side of the duct tape wrapped around Swanson's hands. The defense sought to prove that there was a logical and innocent explanation for defendant's DNA being found on duct tape from the gas station: he worked on Donald Ficklin's Ram Charger, which had a roll bar that he helped wrap in duct tape. However, this defense would become less convincing if defendant's DNA was found on multiple duct tape samples.

## Background

Prior to trial, defense counsel filed a motion to exclude testimony that defendant could not be excluded as a contributor to the partial DNA profile in two mixed-source samples from the side of the duct tape roll and one mixed-source sample from the flat side of the duct tape wrapped around Swanson's hands because the results did not include any statistical analysis. In denying the motion, the trial court found the testimony would be "a rife area for cross-examination." The court also determined the defense arguments went to the weight of the evidence not its admissibility.

At trial, Kacer testified that one of the samples from the duct tape roll and the sample from the flat side of the duct tape roll and the sample from the flat side of the tape wrapped around Swanson's hands contained a mixture of DNA from two contributors. Swanson was one contributor and defendant could not be excluded as the second contributor. A second sample from the duct tape roll contained a mixture of DNA from Swanson and at least two or more minor contributors. Defendant could not be excluded as a possible contributor to the minor types, but he could not be the source of all the minor types. All the other reference samples were excluded as possible contributors.

Kacer stated the sample from the sticky side of the duct tape wrapped around Swanson's hands contained a mixture consistent with two contributors. Kacer was able to obtain a DNA profile and calculated a statistical analysis. He determined he could not exclude defendant as a source of the foreign type to Swanson, and the probability that a random unrelated individual would by chance be included as a possible foreign contributor to the mixture was approximately one in 240 million African-Americans, one in 100 million Caucasians, and one in 67 million Hispanics.

During cross-examination, Kacer testified that as for the blood stains, one could not tell if a person's DNA got there at the same time the blood was shed. In addition, Kacer stated that DNA could be transferred by fingerprint brushes from one place to another.

**Discussion**

Defendant argues the court admitted improper DNA evidence "for which the statistical probability of a match cannot be calculated [which] is scientifically meaningless and therefore irrelevant." Defendant refers to the DNA samples from the stained area on the side of the roll of the duct tape; on an unstained area on the side of a roll of duct tape; and on the flat side on a strip of duct tape removed from Swanson's hands. According to defendant, each of these samples was a mixed sample, containing DNA from more than one person and therefore it was impossible for the DNA expert to tell the jurors to what extent the DNA of anyone in the population could be excluded. In defendant's view: "[T]he court took the novel approach of admitting DNA evidence without any random match probability statistics."

In California, only relevant evidence is admissible. (Evid. Code, § 350.) Relevant evidence is that "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

Evidence of DNA is admissible where it is relevant to make an identification of a suspect, proper scientific procedures were used, and the probability of identification can

30

be quantified.  (Evid. Code, §§ 210, 352; *People v. Venegas* (1998) 18 Cal.4th 47, 82.)
We review the trial court's evidentiary rulings, including those regarding DNA, for an
abuse of discretion.  (*Venegas*, at p. 93.)

The prosecution's expert, Kacer, testified he could not exclude defendant as the
minor contributor on the three samples in question.  Kacer did not proclaim defendant
was a "match."  During closing argument the prosecution did not argue the DNA samples
produced a "match" with defendant's DNA.

In *People v. Her* (2013) 216 Cal.App.4th 977, we concluded that partial DNA
profiles are relevant and admissible, even absent statistical analysis.  We upheld the trial
court's ruling allowing the prosecution's expert to testify that a partial DNA profile found
in both mixed-source samples was consistent with the defendant's DNA.  The evidence
was relevant circumstantial evidence of the murderer's identity in the context of other
DNA evidence.  As in the present case, the prosecution testified the partial profiles were
"consistent" with the defendant's DNA profile, as opposed to being a "match."  We
found the evidence and argument supported by case law, both in California and beyond,
that DNA testimony need not be accompanied by statistical analysis.  (*Id.* at pp. 981-982)

In the present case, the trial court relied on *Her* in finding the DNA evidence
admissible.  Defendant contends *Her* was incorrectly decided and should be reconsidered.
We are not persuaded by defendant's criticisms and find the trial court's admission of the
DNA evidence in question within the trial court's discretion.

## IV

### *Motion for Mistrial Based on Juror Misconduct*

During jury deliberations, defendant moved for a mistrial based on juror
misconduct.  Defendant argued the foreperson reported that a juror had said she wrapped
duct tape around an item at home.  Prior to deliberations, the trial court questioned the
foreperson and the juror.  The trial court removed the juror with the agreement of the

31

parties. The court subsequently denied defendant's motion for a mistrial. Defendant argues the jury was contaminated by the misconduct, requiring reversal.

**Background**

The jury deliberations began late afternoon on Friday, April 17, 2014, and recessed about an hour later. Deliberations resumed the following week. During the lunch break on the first day, the jury foreperson contacted the bailiff. The foreperson "indicated that one of the jurors over the weekend had conducted an experiment at her home using a Styrofoam head and duct tape and had shared the results of that with the other jurors this morning."

The court met with the parties outside the jury's presence and questioned the foreperson. The foreperson explained: "During deliberations one of the jurors stated she had come to a conclusion of how she felt and it was because she was convinced that the duct tape was wrapped by someone that was left handed." The foreperson tried to stop the conversation because he could not remember any discussion of a left-handed maneuver. According to the foreperson, Juror No. 8 "continued that based on the photograph of the person, the victim's head being wrapped, that she realized that it was a left-handed wrap . . . she said, well, when I was home this weekend I used duct tape to wrap something with a left hand and I noticed the left-handed . . . and she noticed that the defendant was writing with his left hand." All the jurors heard these statements. The foreperson told the jurors they must look at the evidence, and the juror agreed there was no evidence presented about a left-handed wrap.

The court questioned the juror in question, Juror No. 8. Juror No. 8 stated she had made a motion with her hand and demonstrated the motion. She said she did not have any tape, but was doing what the court described as moving her hand in a clockwise circle and counterclockwise circle. Juror No. 8 then shared her ideas with her fellow jurors.

The court asked if counsel had any questions; defense counsel said he did not. Defense counsel stated "I think we have a contaminated jury . . . I think we're at a mistrial on this." He agreed to reserve the issue in order to do more research. The court suggested it admonish the jury and send them home to allow counsel to research the issue. In addition, the court gave defense counsel until the next day to move for a mistrial. The trial court reinstructed the jury that it must decides facts based on evidence at trial, not perform experiments, and discuss the case only in the presence of the other jurors.

The parties agreed that Juror No. 8 should be removed. The court had the jury cease deliberations and recessed for the day. The court, "out of an abundance of caution," excused Juror No. 8 from the jury. The court told Juror No. 8 her actions "would be considered -- counsel agrees, that it would be an experiment."

The following morning defense counsel stated he believed more information was needed about what the jurors heard given the disparity between the foreperson's and Juror No. 8's version of events. Defense counsel noted the issue was not what Juror No. 8 actually did, but what she imparted to the other jurors "or what they understood was imparted to them."

The court noted Juror No. 8 was no longer available, but brought the foreperson back. The foreperson stated Juror No. 8 commented that she had wrapped something, he did not remember what, with duct tape to see what it would look like if a left-handed person wrapped it. Juror No. 8 said she used duct tape, and one of the other jurors commented that she should not have done that.

Defense counsel asked the foreperson if Juror No. 8 mentioned using a Styrofoam head, and the foreperson said she hadn't. The prosecution objected to questioning the remaining jurors because it could interfere with deliberations. Defense counsel stated that he had enough information and would not request further inquiry. The court placed

an alternate on the jury and instructed the jury to disregard past deliberations and begin anew.

Subsequently, defense counsel filed a motion for a mistrial based on Juror No. 8's conduct. Defense counsel stated Juror No. 8's "characterization of her actions amount to those mentioned in *Collins*."[5] However, defense counsel argued the foreperson's description of events described an impermissible experiment. In response, the People contended Juror No. 8's conduct was not an impermissible experiment but a statement of her opinion on the evidence.

The trial court denied the motion. The court began by noting Juror No. 8 was removed from the jury out of "an abundance of caution" and with the agreement of both parties. In addition, the court found the foreperson may have been mistaken that actual duct tape had been used. Based on Juror No. 8's testimony, the court found Juror No. 8 had thought about the duct tape during the weekend. When she returned to the jury room, she looked at the photographs and made her determination. Given Juror No. 8's testimony, the court found there was no improper experiment, but only a juror's view of the evidence.

After the verdict, defense counsel filed a motion for a mistrial based on Juror No. 8's misconduct. The motion cited an additional juror who stated former Juror No. 8 had told all the jurors that, while at home, she wrapped duct tape around an object as if she was right-handed and then repeated the exercise as if she was left-handed. The other jurors told Juror No. 8 she should not have done that. Defense counsel did not provide a declaration from the additional juror.

Defense counsel argued the description provided by the foreperson and the additional juror conflicted with Juror No. 8's version of events. The court found no juror

---

[5] *People v. Collins* (2010) 49 Cal.4th 175.

misconduct, noting it had asked Juror No. 8 about her actions and she stated she had not wrapped tape around a foam head. The court compared the dilemma to a game of "telephone," where a statement travels through many people undergoing a metamorphosis during repetition.

**Discussion**

Defendant disputes the trial court's finding that Juror No. 8 did not conduct an experiment and therefore erred in denying defendant's motion for a mistrial. According to defendant, "even accepting the trial court's finding that juror 8 did nothing improper, a mistrial was required if the foreperson (or any other juror) understood – even if incorrectly – that juror 8 actually used duct tape, determined that defendant was left-handed and decided this new 'evidence' pointed to guilt because the tape was wrapped by a left-handed person."

The People argue defendant forfeited the issue by failing to object in the trial court based specifically on the issue of jury contamination as opposed to whether Juror No. 8 actually committed misconduct. We disagree. Defense counsel, after the foreperson and Juror No. 8 described the events in question, stated "we have a contaminated jury." The following morning, during further discussions, defense counsel commented Juror No. 8 "has probably contaminated everybody." Defense counsel preserved the issue for appeal.

A defendant may move for a new trial based on juror misconduct. (§ 1181, subd. 2.) In determining whether to grant a new trial based on such misconduct, the trial court engages in a three-step review. First, the court determines the admissibility of the evidence presented. Second, if the court finds the evidence admissible, it decides whether the evidence establishes misconduct. Finally, if the court finds misconduct, it must determine whether the misconduct was prejudicial. Once misconduct has been established, prejudice is presumed. Reversal is required unless the court finds, after examining the entire record, there is no substantial likelihood any juror was improperly influenced to defendant's detriment. (*People v. Bryant* (2011) 191 Cal.App.4th 1457,

35

1467; *People v. Duran* (1996) 50 Cal.App.4th 103, 111-113.) We review the court's denial of a motion for a mistrial based on a claim of juror misconduct for an abuse of discretion. (*People v. Jenkins* (2000) 22 Cal.4th 900, 985-986.)

Defendant argues regardless of the experiment Juror No. 8 actually performed, the court should have granted a mistrial, even if the juror did nothing improper. According to defendant: "[I]t simply does not matter whether juror 8 *actually* conducted an improper experiment before she was discharged; what matters is whether one or more of the remaining jurors understood that an improper experiment had been conducted."

However, a juror's interpretation of what another juror said or did is not dispositive of whether juror misconduct occurred. It is the province of the trial court to determine whether jury misconduct took place. The court found Juror No. 8 had not used duct tape or a foam head: "I specifically asked her, did you use any other kind of tape and she said no, I did, you know, this . . . which we described as circling her hand in the air counterclockwise and circling her hand in the air clockwise, and then reviewed the photographs and determined that there was a left-handed wrap on the tape. And that she had observed in the courtroom, the defendant writing with his left hand. [¶] . . . [¶] I think there may have been some misinterpretation by the foreperson that actual duct tape was used. And . . . listening to the direct statements from [Juror No. 8] that . . . she thought about this and everything and then she came in and looked at the photographs and made her determination."

Moreover, not every experiment constitutes jury misconduct. Jurors are allowed latitude in their deliberations to permit them to use common experiences and illustrations to aid them in reaching a verdict. (*People v. Bogle* (1995) 41 Cal.App.4th 770, 778.) A juror may evaluate the evidence, subjecting it to careful analysis by testing all reasonable inferences. (*People v. Collins, supra*, 49 Cal.4th at p. 249.)

Even assuming the foreperson's belief supported a claim for misconduct, we find no prejudice. Following Juror No. 8's comments, the foreperson told the jury they must

36

only consider the evidence presented.  The trial court replaced Juror No. 8 with an alternative juror and instructed the jury to begin deliberations anew and to disregard any prior deliberations.

## V

### *CALCRIM No. 359*

Defendant contends the trial court's instruction pursuant to CALCRIM No. 359 violated his rights under the Fifth and Sixth Amendments.  Under defendant's reasoning, the instruction that "the identity of the person who committed the crime . . . may be proved by the defendant's statement alone" should not have been given, since identity was the only issue at trial.

**Background**

Defendant did not object when the court instructed the jury pursuant to CALCRIM No. 359:  "The defendant may not be convicted of any crime based on his out-of-court statements alone.  You may only rely on the defendant's out-of-court statements to convict him if you conclude that other evidence shows that the charged crime or a lesser include offense was committed.  [¶]  That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed.  [¶]  The identity of the person who committed the crime and the degree of the crime may be proved by the defendant's statements alone.  [¶]  You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt."

In addition, the court instructed the jury to consider with caution any statement by defendant tending to show his guilt unless the statement was written or otherwise recorded.  (CALCRIM No. 358.)  The court also instructed the jury to consider all evidence and to find defendant not guilty unless the prosecution proved him guilty beyond a reasonable doubt.  (CALCRIM No. 220.)

**Discussion**

Defendant contends his statements "plainly were insufficient to establish his identity as the killer beyond a reasonable doubt – telling the jury it could rely solely on those statements to infer identity abrogated the state's burden of proof beyond a reasonable doubt." According to defendant, the testimony by Jenna Weller and Peggy Burnham regarding defendant's statements did not establish defendant's guilt beyond a reasonable doubt.

As noted, Weller, who lived with defendant in 2010, testified that defendant once asked her if she believed "God forgave murderers." Weller asked why defendant wanted to know and defendant replied that "when he was younger, him and some friends did something and he thought somebody might have died."

Burnham testified she last saw defendant around the time of the homicide in the Kmart parking lot across from the gas station. Defendant asked Burnham for money and then looked across the street and said "the Shell Station" or "what about the Shell Station?"

Defendant acknowledges the court instructed the jury that it had to find defendant guilty beyond a reasonable doubt. However, he argues there "is at least a reasonable likelihood" the jury would have interpreted the instructions to allow them to find defendant's statements alone would satisfy the requirement of beyond a reasonable doubt. In essence, defendant argues the court's instructions diminished the prosecution's burden of proof.

The court must instruct, even in the absence of a request, on the general principles of law relevant to the issues raised by the evidence. These general principles refer to those principles closely and openly connected with the facts before the court and that are necessary to the jury's understanding of the case. (*People v. Sedeno* (1974) 10 Cal.3d 703, 715, overruled on another ground in *People v. Breverman* (1998) 19 Cal.4th 142, 163.) However, the court is under no duty to instruct on points of law not relied on by

the parties. Before the instruction, the court must find legally sufficient evidence in the record to support the finding or inference the instruction permits. (*People v. Hannon* (1977) 19 Cal.3d 588, 597-598.) We consider the instructions as a whole to determine whether they correctly state the law. (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1237.)

We assess de novo whether the instructions correctly state the law and whether the instructions effectively direct a finding adverse to the defendant by removing an issue from the jury's consideration. In reviewing the instructions, we assume the jurors are intelligent persons, capable of understanding and correlating the given instructions. (*People v. Posey* (2004) 32 Cal.4th 193, 218; *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

In reviewing the claim that the given instructions lowered the standard of proof, we consider whether there is a reasonable likelihood the jury misapplied the instruction. We do not view the challenged instruction in isolation, but consider it in the context of the instructions as a whole. (*People v. Williams* (2013) 56 Cal.4th 630, 688-689; *People v. Moore* (2011) 51 Cal.4th 1104, 1140.)

As the People note, defendant failed to object to the instruction, and they contend he forfeited the claim on appeal. However, defendant argues the challenged instruction undercut his substantial rights, which the People concede allows us to entertain his arguments on appeal. Accordingly, we will address defendant's contention to forestall an ineffective assistance of counsel claim.

Defendant maintains that because identity was the central issue, CALCRIM No. 359 impermissibly lowered the prosecution's burden to prove identity beyond a reasonable doubt. In support, defendant relies on *People v. Rivas* (2013) 214 Cal.App.4th 1410 (*Rivas*).

In a criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—the fact of loss, injury, or harm caused by a criminal act. The prosecution

must establish the corpus delicti independent from the defendant's admissions, ensuring that the defendant does not admit to a crime which did not occur. The independent proof may be circumstantial and is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also possible. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168-1171 (*Alvarez*).) The amount of independent proof of a crime can be slight or minimal. The prosecution need make only a prima facie showing permitting the reasonable inference that a crime was committed. Once the necessary showing of independent evidence is met, defendant's extrajudicial statements may be considered by the jury to strengthen the case on all issues. (*People v. Jones* (1998) 17 Cal.4th 279, 301-302; *Alvarez, supra*, 27 Cal.4th at p. 1171.)

The identity of the defendant as the perpetrator is not part of the corpus delicti. Identity may be established by the defendant's words alone. (*People v. Frye* (1998) 18 Cal.4th 894, 960, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22.) When a defendant's statements form part of the prosecution's case, the trial court must instruct sua sponte that a finding of guilt cannot be predicated on the statements alone. (*Alvarez, supra*, 27 Cal.4th at p. 1170.) The corpus delicti rule is defined in CALCRIM No. 359 and its predecessor, CLJIC No. 2.72. (*People v. Rosales* (2014) 222 Cal.App.4th 1254, 1258-1259 (*Rosales*).)

In *Rivas, supra*, 214 Cal.App.4th 1410, relied on by defendant, the court found the first two paragraphs of CALCRIM No. 359 correctly state the law of corpus delicti. However, the court found the instruction was confusing because the third paragraph regarding the declarant's identity: "[T]he reference to identity in CALCRIM No. 359 presents a risk of confounding the jury by telling jurors that a defendant's inculpatory extrajudicial statements, taken alone, do not suffice to allow the jury to convict the defendant of a charged crime—and yet those statements, again taken alone, are entertainable to prove the defendant's 'identity [as] the person who committed the crime' (CALCRIM no. 359, 3d par.), which to any juror can only mean the defendant's identity

as the perpetrator, i.e., the guilty party. The instruction requires reconsideration." (*Rivas, supra*, 214 Cal.App.4th at p. 1429.)

However, subsequently the court in *Rosales, supra*, 222 Cal.App.4th 1254 considered the purpose of the corpus delicti rule and disagreed with the *Rivas* court, finding CALCRIM No. 359 was not confusing. According to *Rosales*, it is "well established that a defendant's inculpatory out-of-court statements *may* . . . be relied upon to establish his or her identity as the perpetrator of a crime. [Citations.] This is because the perpetrator's identity is not part of the corpus delicti. [Citations.] [¶] CALCRIM No. 359, like CALJIC No. 2.72, clearly so states. The corpus delicti rule is stated in the first two paragraphs of CALCRIM No. 359. The law concerning proof of identity by a defendant's extrajudicial statements is correctly stated in the third paragraph. There is no danger a jury will be unable to separate the two rules any more than in CALJIC No. 2[.]72 which has been approved by our Supreme Court . . . As noted CALJIC No. 2.72 states in part: 'The identity of the person who is alleged to have committed a crime is not an element of the crime [nor is the degree of the crime]. The identity [or degree of the crime] may be established by [a] [an] [confession] [or] [admission].' CALCRIM No. 359 states with greater precision and economy of language, 'The identity of the person who committed the crime [and the degree of the crime] may be proved by the defendant's statement[s] alone.' CALCRIM No. 359 correctly states the law. [Citations.] There was no reasonable likelihood the jury was confused and misapplied the instruction. Finally, CALCRIM No. 359 reminds the jury that the accused may not be convicted unless the prosecution proves guilt beyond a reasonable doubt. CALJIC No. 2.72, which was approved by our Supreme court in [*People v.*] *Foster* [(2010) 50 Cal.4th 1301,] contains no such reminder." (*Rosales, supra*, 222 Cal.App.4th at pp. 1260-1261.)

We agree with *Rosales*'s analysis of CALCRIM No. 359 and conclude the court's instruction neither misled nor confused the jury. Defendant agrees that *Rosales* is a generally correct statement of law, but "in a case like this, where identity is the only real

issue and defendant's statements do not prove identity beyond a reasonable doubt, telling jurors they may rely on defendant's statements alone to infer identity undermines the state's burden of proof by proving identity beyond a reasonable doubt." However, this argument overlooks the DNA evidence which placed defendant at the scene of Swanson's murder; it was not just his statements that identified him as the killer, but the DNA on the tape. We find no error.

## VI

### *Robbery and Burglary Special-circumstance Allegations*

Defendant argues, under the circumstances, the special-circumstance allegations, killing during the commission of a burglary and killing during the commission of a robbery, violate the Eighth Amendment and his sentence of life without the possibility of parole (LWOP) must be reversed. According to defendant, his sentence permitted the imposition of enhanced punishment without proof of any culpable mens rea as to the actual killing.

**Background**

The People based defendant's murder charge on two theories: malice aforethought and felony murder. The court instructed the jury that it could not find defendant guilty of first degree murder unless they agreed that the prosecution proved first degree murder under at least one of these theories. They need not agree on the same theory.

The instructions further informed the jury that defendant could be convicted of felony murder if he caused the death of another person even if the killing was unintentional, accidental, or negligent. The court further instructed: "If the defendant was not the actual killer, then the People have the burden of proving beyond a reasonable doubt that he acted with the intent to kill for the special circumstances of murder in the course of a robbery or murder in the course of a burglary. If the People have not met this burden, you must find these special circumstances have not been proven true."

42

The jury found defendant guilty of first degree murder. The jury also found the robbery and burglary special circumstances to be true

**Discussion**

According to defendant, the robbery and burglary special circumstance violates the Eighth Amendment because it imposes LWOP for an accidental killing. Although defendant recognizes that his argument was rejected by the Supreme Court in *People v. Taylor* (2010) 48 Cal.4th 574, 661 and *People v. Hayes* (1990) 52 Cal.3d 577, 631-632, he argues the punishment imposed in his case is unconstitutional.

We disagree. The Supreme Court even more recently reiterated its finding that when a defendant is the actual killer, neither intent to kill nor reckless indifference to life is a constitutionally required element of felony-murder special circumstance. (*People v. Jackson* (2016) 1 Cal.5th 269, 346-347; *People v. Contreras* (2013) 58 Cal.4th 123, 163-166.) We find no violation of the Eighth Amendment.

# VII

## *Marsden Hearing*

Finally, defendant challenges the trial court's response to his post-trial request to replace his appointed counsel. According to defendant, the court followed "incorrect procedure" during the *Marsden* hearing, necessitating a remand for a new *Marsden* hearing.

**Background**

Following the jury's guilty verdict, defense counsel, Erik Schlueter, filed a motion for a new trial. Defense counsel later informed the trial court that, during discussions on the new trial motion, defendant raised the issue of ineffective assistance of counsel. Defense counsel requested the court to appoint an attorney to investigate the allegations. Without holding a hearing, the trial court appointed an attorney, Eric Davenport, to review the issue.

*Confidential Hearing with Davenport and Schlueter*

In December 2014 the trial court held a confidential hearing after receiving a letter from defendant. Defendant requested a *Marsden* hearing to address his claim of ineffective assistance of counsel. Attorneys Schlueter and Davenport and defendant attended.

Defendant explained that he wanted to make sure Davenport was reviewing defendant's concerns and he was not sure whether he needed to reference *Marsden* to accomplish this. The court ascertained that defendant was satisfied with Davenport's review of his ineffective assistance of counsel claim. Defendant confirmed that he was satisfied.

*Confidential Hearing with Davenport*

On January 26, 2015, defendant wrote the court raising concerns about trial counsel: "I would like to go on record as asking/requesting that regardless of matters looked into by Eri[c] Davenport, do [*sic*] to irreconcilable conflict and a disagreement over preparation of motions for new trial based on repeated issues I have pointed out to Mr. Schlueter throughout this trial, I feel Erik Schlueter can not and will not prepare and argue my motions for new trial to the best of his abilities and/or in my best interests." The following day, defendant sent the court a second letter specifically questioning Davenport's appointment for three reasons: (1) Davenport handled legal issues for the court in the past, (2) Davenport previously worked with Schlueter in the district attorney's office, and (3) Davenport never visited defendant in jail to hear his version of events.

On January 30, 2015, the trial court held a confidential hearing after it received a letter from defendant stating he believed Davenport had a conflict of interest. Defendant and Davenport attended; Schlueter did not attend.

The trial court informed defendant that Davenport had never represented the court in any capacity as an attorney. Defendant stated he still believed there was a conflict of

44

interest. He also informed the court Davenport had not come to the jail for a meeting defendant had requested.

Defendant believed that discussions he had with Schlueter and notes of these discussions were relevant to the ineffective assistance claim. The court responded that these communications constituted attorney-client privilege and neither Davenport nor the court could look into it unless the privilege was waived by both defendant and Schlueter.

Davenport did review the notes as well as about 200 pages of notes setting forth defendant's concerns. Although he had not gone to the jail to speak with defendant, Davenport stated defendant provided him with extensive documentation. Davenport thoroughly reviewed defendant's reasons for requesting a new trial, including ineffective assistance, and determined there was no basis for the claim.

Defendant stated his main concern was that Schlueter initially failed to obtain defendant's text records. The records established that he and Weller first met when she moved in with him. Davenport acknowledged defendant noted this concern in his notes. Defendant also argued Schlueter failed to do a proper investigation. The court explained that this was not the time to discuss the issue because the court was addressing the conflict defendant raised in a letter about counsel's relationship to the judge. The judge again stated he had no relationship with either Davenport or Schlueter.

### *Open Court Hearing with Davenport*

That same day, in open court, Davenport stated he had not found a good faith basis for filing a motion for a new trial. Davenport reiterated his extensive review of all the documentation provided by defendant. In addition, Davenport provided defendant with a nine-page summary of all defendant's concerns with the attorney's reaction and analysis. The court relieved Davenport of his representation of defendant for the purpose of reviewing a motion for a new trial.

When the court scheduled the hearing date for the motion for a new trial, defendant stated he wanted a full *Marsden* hearing. Defendant explained he had reserved

45

the right to a hearing at the earlier hearing. The court responded that it would set a hearing on defendant's *Marsden* request for February 6, 2015.

### *February 6, 2015 Confidential Hearing*

On February 6, 2015, the court conducted a *Marsden* hearing with defendant and Schlueter. Defendant sought to show ineffective assistance of counsel and that substitute counsel should be appointed for Schlueter. The court stated that the ineffective assistance claim was an issue for appeal and there was no motion per se for ineffective assistance at that point in the proceedings. The court explained that a *Marsden* motion is a motion to relieve court-appointed counsel and "you tell me why."

Defendant argued he had not been properly represented; an irreconcilable conflict prevented him communicating with Schlueter. Communication between the two had broken down at the very beginning and Schlueter was no longer taking his calls.

The court asked defendant to provide more specifics regarding his request. Defendant responded: "Okay. If so, I need to sit down. I need to open these files up. I need an opportunity to meaningfully review the information and actually present my issues." The court stated: "I'm not going to go through your ineffective assistance of counsel claims one at a time . . . that's not the purpose of this particular hearing. [¶] I will accept from you, and you have repeatedly said, that he was ineffective during trial; you think he's going to be ineffective in prosecuting the motions for a new trial, and all of that; so I'll accept that. Just wholesale it. [¶] . . . [Y]ou've mentioned irreconcilable differences between the two of you. Be more specific as to that."

Defendant stated Schlueter visited him only once during the trial. Whenever defendant spoke with Schlueter he would not do as defendant requested. Schlueter recently failed to respond to his phone calls. After further discussion with the court, defendant offered more specific complaints. Schlueter failed to obtain defendant's text messages with Weller for the time period defendant requested. Schlueter also did not hire experts defendant requested. Defendant argued the court had to remind Schlueter to

46

respond to the People's motion to exclude third party culpability evidence, and the response raised only surface arguments.

Defendant argued being handcuffed was preventing him from adequately presenting his concerns. The court ordered defendant unshackled. Defendant admitted he was not as prepared as he should be, but proceeded to present his complaints. He stated he told Schlueter that Weller lied to defendant about having a brother and Weller's mother said Weller had a problem with honesty. Weller's mother's testimony at the preliminary hearing would have cast doubt on Weller's testimony and prevented it from being admitted at trial. Defendant asked Schlueter to get a doctor to testify about the impact of drugs on Weller's memory. Defendant also posited that Schlueter should have had a doctor testify about the impact of prescription drugs on Burnham's memory.

In addition, Schlueter failed to produce an expert with respect to sound recording, chain of custody, DNA analysis, or Cooksey's duct tape layout. Nor did Schlueter respond to defendant's request for a change of venue. The court responded the motion would not have succeeded given the lack of knowledge the jurors had of the case. Although defendant complained Schlueter brought only one pretrial motion, the court noted there were numerous pretrial motions filed by both parties.

Defendant also contended Schlueter often said "who cares" during his closing argument. He also faulted Schlueter with taking defense witnesses out of order and argued the defense case should have lasted at least a week and not a day and a half.

The court offered Schlueter an opportunity to respond. Schlueter stated he blocked defendant's calls over a weekend because he told defendant he would not be working on the case that weekend. He explained he had spent many hours on the case and did not feel the need to respond to the other allegations.

The court indicated it reviewed invoices of Schlueter's work on the case, which revealed counsel had spent many hours in preparation for trial. The court denied defendant's *Marsden* motion.

47

**Discussion**

Defendant contends the case must be remanded for a proper *Marsden* hearing. According to defendant, the trial court employed an incorrect procedure in responding to defendant's request for new counsel.

*Marsden* established the right of a criminal defendant to make a motion to discharge court-appointed counsel and substitute new counsel. Under *Marsden*, a defendant who makes such a motion must be allowed to state the specific reasons for his or her dissatisfaction with currently appointed counsel. (*Marsden, supra*, 2 Cal.3d at pp. 123-124.)

In turn, if the defendant establishes that his or her right to counsel has been " ' " 'substantially impaired,' " ' " substitute counsel must be appointed. (*People v. Sanchez* (2011) 53 Cal.4th 80, 90.) Substantial impairment can be established in two ways: when the attorney is providing constitutionally substandard representation, or when the defendant and defense counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result. (*People v. Clark* (2011) 52 Cal.4th 856, 912.)

Appointment of new counsel is appropriate in the face of an irreconcilable conflict between a defendant and defense counsel because such conflict is fatal to an effective attorney-client relationship. (*People v. Ortiz* (1990) 51 Cal.3d 975, 984.) In determining whether such a destructive conflict exists, we consider the degree of hostility and the impact such hostility has on communication between the defendant and defense counsel. (*Hudson v. Rushen* (9th Cir. 1982) 686 F.2d. 826, 832; *People v. Daniels* (1991) 52 Cal.3d 815, 843.)

We review the trial court's denial of a defendant's *Marsden* motion for an abuse of discretion. We do not reverse unless the defendant has shown the trial court's failure to replace counsel substantial impaired the defendant's right to assistance of counsel. (*People v. Taylor, supra*, 48 Cal.4th at p. 599.) When reviewing whether the trial court

abused its discretion, we consider whether it made an adequate inquiry into the defendant's complaints. (*People v. Mungia* (2008) 44 Cal.4th 1101, 1127-1128.)

Initially, defendant did not clearly indicate that he wanted to discharge Schlueter; instead, defendant agreed to the appointment of Davenport to consider the filing of a motion for a new trial. A defendant must make a clear indication that he or she is requesting a substitute attorney. (*People v. Dickey* (2005) 35 Cal.4th 884, 920) In any event, the court did hold a *Marsden* hearing on February 6, 2015, after defendant clearly requested one.

Defendant argues the trial court failed to conduct an adequate *Marsden* hearing by applying the wrong standard. He cites the trial court's statement that ineffective assistance of counsel is an "appeal issue." However, the court was responding to defendant's statement that, in addition to the substitution of counsel, he wanted to raise a separate claim of ineffective assistance of counsel. The trial court explained that as to a separate claim "there is no motion per se for ineffective assistance of counsel at this juncture" and that such a claim was an issue to be addressed on appeal. The court went on to explain that a *Marsden* motion allowed defendant to explain why his court-appointed defense counsel should be relieved.

The court allowed defendant to explain his concerns with defense counsel. We conclude the trial court made an adequate inquiry into defendant's complaints regarding trial counsel. "[A] criminal defendant who seeks to substitute counsel must be allowed to state the specific reasons for his [or her] dissatisfaction with counsel." (*People v. Clemons* (2008) 160 Cal.App.4th 1243, 1250.) The trial court provided defendant with that opportunity in the present case. Defendant was permitted to state his grievances, at length.

Defendant also argues the *Marsden* hearing was inadequate because the trial court did not require Schlueter to respond to defendant's complaints. However, whether it is necessary for a trial court to actively question the defendant's attorney depends on the

49

nature of the grievances expressed by the defendant and the information available to the court. (*People v. Hill* (1983) 148 Cal.App.3d 744, 753; *People v. Penrod* (1980) 112 Cal.App.3d 738, 746-747.) Here, Schlueter addressed defendant's complaint that the defense attorney blocked his calls. Schlueter then reminded the court of the hours he had put into the defense and explained that he did not feel the need to respond specifically to defendant's other complaints. Defendant's other complaints amounted to tactical disagreements about motions to be filed, experts to be called, the order of witnesses, questions to be asked by defense counsel, and the nature of counsel's closing argument. Defendant also contends the trial court should have inquired further regarding Schlueter's lack of investigation into his text messages. However, a defense counsel's tactical choices do not amount to ineffective representation. (*People v. Welch* (1999) 20 Cal.4th 701, 728-729.) The trial court properly denied defendant's *Marsden* motion.

## DISPOSITION

The judgment is affirmed.

　　　　　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　　　RAYE, P. J.

We concur:

　　　/s/
BLEASE, J.

　　　/s/
MURRAY, J.